# UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

_____

No. 23-1652

_____

## MICHELE TOURANGEAU,

Plaintiff - Appellant,

v.

## NAPPI DISTRIBUTORS,

Defendant - Appellee.

_____

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MAINE

## **BRIEF OF APPELLEE**

John J. Wall, III (Bar No. 40729)
Laura A. Maher (Bar No. 1203856)
Monaghan Leahy, LLP
Attorneys for Appellee
95 Exchange Street, P.O. Box 7046
Portland, Maine 04112-7046
(207) 774-3906
jwall@monaghanleahy.com

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

_____

No. 23-1652
_____

MICHELE TOURANGEAU,

Plaintiff - Appellant,

v.

NAPPI DISTRIBUTORS,

Defendant - Appellee.

_____


ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE


**BRIEF OF APPELLEE**


John J. Wall, III (Bar No. 40729)
Laura A. Maher (Bar No. 1203856)
Monaghan Leahy, LLP
Attorneys for Appellee
95 Exchange Street, P.O. Box 7046
Portland, Maine 04112-7046
(207) 774-3906
jwall@monaghanleahy.com

# TABLE OF CONTENTS

Page

Table of Authorities .................................................................. iii

Jurisdictional Statement ..............................................................1

Statement of the Issues................................................................2

Statement of the Case..................................................................3

Statement of the Standards of Review ................................................29

Summary of Argument ................................................................31

Argument................................................................................33

I.    THE TRIAL EVIDENCE SUPPORTED THE JURY'S
VERDICT ON NAPPI DISTRIBUTORS' DEFENSE TO
TOURANGEAU'S EPA CLAIM. .........................................33

    A. Tourangeau waived any objection she may have had
regarding submission of Nappi's affirmative defenses to the
jury. ................................................................................34

    B. As the District Court correctly held, the trial evidence
supported the jury's conclusion that Nappi had proved its
EPA affirmative defense.................................................36

II.    THE TRIAL EVIDENCE DID NOT SUPPORT
TOURANGEAU'S PROFFERED "*CORNING*
INSTRUCTION.*"* ................................................................40

III.    THE DISTRICT COURT'S RULINGS DURING JURY
SELECTION ON CHALLENGES FOR CAUSE WERE WELL
WITHIN ITS CONSIDERABLE DISCRETION.................................45

    A. The District Court properly excused Juror No 14 for cause
and Tourangeau has waived any *Batson*-style argument. ...............46

**B. The District Court properly declined to excuse Juror No. 89 for cause and Tourangeau waived her juror bias argument.** .......... 48

**IV. THE DISTRICT COURT CORRECTLY RULED THAT TOURANGEAU PRESENTED NO EVIDENCE OF JUROR BIAS OR MISCONDUCT.** ....................................................... 52

Conclusion ............................................................................. 59

Certificate of Compliance with Typeface and
Length Limitations .................................................................. 60

Certificate of Service ............................................................... 61

# TABLE OF AUTHORITIES

Page(s)

**Federal Cases**

*Cabrera v. Macomber*, No. 1:15-cv-01547-LJO-EPG-HC,
2018 U.S. Dist. LEXIS 132969 (E.D. Cal. Aug. 7, 2018)......................................57

*Corning Glass Works v. Brennan*,
417 U.S. 188 (1974)....................................................................................40, 42

*Crowley v. L.L. Bean, Inc.*,
303 F.3d 387 (1st Cir. 2002)....................................................................30, 31, 53

*Elliott v. S.D. Warren Co.*,
134 F.3d 1 (1st Cir. 1998).................................................................................41

*Estate of Keatinge v. Biddle*,
316 F.3d 7 (1st Cir. 2002)..............................................................................41, 42

*Faigin v. Kelly*,
184 F.3d 67 (1st Cir. 1999).................................................................................30

*Henderson v. Chartiers Valley Sch.*,
136 F. App'x 456 (3d Cir. 2005) .........................................................................44

*Jones ex rel. United States v. Mass. Gen. Hosp.*,
780 F.3d 479 (1st Cir. 2015)...............................................................................29

*Kotler v. Am. Tobacco Co.*,
926 F.2d 1217 (1st Cir. 1990).........................................................................45, 46

*Mesías v. Hosp. Hima San Pablo*, No. 18-1988 (JAG),
2021 U.S. Dist. LEXIS 57090 (D.P.R. Mar. 24, 2021) .........................................33

*Monteagudo v. Asociacion de Empleados del Estado Libre Asociado*,
554 F.3d 164 (1st Cir. 2009)...............................................................................33

*Poy v. Boutselis*,
352 F.3d 479 (1st Cir. 2003)...............................................................................29

*Raiche v. Pietroski,*
623 F.3d 30 (1st Cir. 2010)..............................................................29, 33

*Ray v. Ropes & Gray LLP,*
799 F.3d 99 (1st Cir. 2015)....................................................................34

*Rosa-Rivera v. Dorado Health, Inc.,*
787 F.3d 614 (1st Cir. 2015)..................................................................41

*Sampson v. United States,*
724 F.3d 150 (1st Cir. 2013)..................................................................53

*Sanchez v. P.R. Oil Co.,*
37 F.3d 712 (1st Cir. 1994)....................................................................30

*Sanchez v. Roden,*
753 F.3d 279 (1st Cir. 2014)..................................................................47

*Tang v. Citizens Bank,*
741 F. App'x 11 (1st Cir. 2018)........................................................34, 36

*United States v. Aponte-Suarez,*
905 F.2d 483 (1st Cir. 1990)..................................................................53

*United States v. Bartelho,*
71 F.3d 436 (1st Cir. 1995)....................................................................30

*United States v. Costa,*
890 F.2d 480 (1st Cir. 1989)..................................................................52

*United States v. Desir,*
273 F.3d 39 (1st Cir. 2001)....................................................................51

*United States v. Encarnacion,*
26 F.4th 490 (1st Cir. 2022)..................................................................46

*United States v. French,*
904 F.3d 111 (1st Cir. 2018)..................................................................56

*United States v. Gibson*,
353 F.3d 21 (D.C. Cir. 2003) ...............................................................52, 58

*United States v. Gonzalez-Soberal*,
109 F.3d 64 (1st Cir. 1997) ...............................................................30

*United States v. McCarthy*,
961 F.2d 972 (1st Cir. 1992) ...............................................................30

*United States v. McNeill*,
728 F.2d 5 (1st Cir. 1984) ...............................................................49

*United States v. Uribe*,
890 F.2d 554 (1st Cir. 1989) ...............................................................53

*United States v. Zannino*,
895 F.2d 1 (1st Cir. 1990) ...............................................................49

## Federal Statutes

28 U.S.C. § 1291 ...............................................................2

28 U.S.C. § 1331 ...............................................................1

28 U.S.C. § 1367 ...............................................................1

## Other Materials

U.S. Dist. Ct. for Maine – Pattern Jury Instruction for Cases of Employment
Discrimination 4.1 ...............................................................44

# JURISDICTIONAL STATEMENT

Appellant Michele Tourangeau filed her Complaint in this matter on January 10, 2020. Joint Appendix at JA1 (hereinafter "App. at __"). Tourangeau asserted a number of claims against Appellee Nappi Distributors ("Nappi") grounded on federal statutes, including the Equal Pay Act ("EPA"), 29 U.S.C. § 206 *et seq*., the Pregnancy Discrimination Act ("PDA"), 42 U.S.C. § 2000e(k), and Title VII, 42 U.S.C. § 2000e *et seq*. App. at JA24-42. She also asserted claims under Maine law, including the Maine Human Rights Act ("MHRA"), 5 M.R.S. § 4571 *et seq*., the Maine Timely and Full Payment of Wages Law ("MTFPWL"), 26 M.R.S. § 621-A *et seq*., quantum meruit, and unjust enrichment. App. at JA24-42. Pursuant to 28 U.S.C. § 1331, the United States District Court for the District of Maine ("the District Court") exercised federal question jurisdiction over the claims Tourangeau asserted under federal law. It exercised supplemental jurisdiction over Tourangeau's state law claims pursuant to 28 U.S.C. § 1367(a).

By an order dated November 29, 2022, the District Court granted in part and denied in part Nappi's motion for summary judgment. United States District Court for the District of Maine, Civil No. 2:20-cv-00012-JAW, ECF Docket Entry No. 106 (hereinafter "ECF No. __"). On March 6, 2023, the District Court entered judgment in favor of Nappi on all claims that survived summary judgment based on a jury verdict. Addendum to Appellant's Brief at 5 (hereinafter "Add. at __").

1

On July 18, 2023, the District Court denied Tourangeau's motion for a new trial and entered an amended final judgment. Add. at 6-77 & 78. Tourangeau filed a notice of appeal of the amended final judgment on August 7, 2023. App. at JA22. Therefore, the United States Court of Appeals for the First Circuit exercises jurisdiction over the appeal pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

I.     Whether the District Court abused its discretion in determining that the evidence supported the jury's verdict on Tourangeau's EPA claim.

II.    Whether the District Court committed reversible error in its instructions to the jury concerning Tourangeau's EPA claim.

III.   Whether the District Court abused its discretion in its rulings during jury selection on challenges for cause.

IV.    Whether the District Court abused its discretion in denying Tourangeau's motion for new trial predicated on alleged juror bias.

## STATEMENT OF THE CASE

### I.     Case Overview

Beginning in January of 2015, Tourangeau worked for Nappi as a wine sales representative. App. at JA261 & JA284. At the time Nappi hired Tourangeau,

Nappi's former Wine Sales Director, Paul Carr, advised Tourangeau that her expected starting salary, commissions, and incentives would total about $60,000.00, with the ability to make more based upon her work ethic. App. at JA276 & JA277-78. Tourangeau was still working for Nappi as a wine sales representative at the time of trial. App. at JA545.

Beginning around 2014, and before Tourangeau applied for a position at Nappi, Nappi started the process of reducing the pay scale of its wine sales representatives and elected to do so by offering two-percent commissions to all newly hired wine sales representatives after 2014, rather than three percent, which was the previous rate. App. at JA530; JA663; JA906-07. Nappi's President, Frank Nappi, Jr., made this decision because three-percent commissions in the wine department were not sustainable given the shrinking margins on wine sales resulting from increased overhead and fuel costs. App. at JA875; JA907; JA977. Nappi decided that the existing wine sales representatives – those with long tenure at the company (and whom Nappi did not want to lose) – would maintain the three-percent rate, but all new hires would receive two-percent commissions. App. at JA977-78. Therefore, when Nappi hired Tourangeau it paid her – and every wine sales representative hired after her – a two-percent commission rate. App. at JA907-08.

Nappi wine sales representatives with routes in southern Maine, such as the route Nappi hired Tourangeau to work, did not typically receive salaries as part of their compensation. App. at JA810 & JA871. However, Nappi initially offered Tourangeau a salary in addition to her commission and incentive pay to offset the then-more seasonality of her route and to allow her to develop and establish relationships within her route. App. at JA277-78. Of the wine sales representatives with routes in the southern part of the state, only Tourangeau and one other wine sales representative, Dan Toolan, were offered salaries in addition to commission and incentives. App. at JA745. Dan Toolan, a male wine sales representative hired shortly after Tourangeau in 2015, was also paid a two-percent commission rate. App. at JA746.

Beginning in late 2018, Nappi's new Director of Wine Sales, Matt Watson, reviewed Nappi's existing sales routes and implemented some restructuring. App. at JA960. The changes involved a long overdue re-routing or re-assignment of sales accounts to improve efficiencies and build sales capacity, a standard process throughout the beverage distribution industry. App. at JA1105-06. As part of the announcement to the wine sales team, Watson informed all sales representatives that the planned rerouting was intended to geographically streamline routes as much as practical and would possibly impact compensation for some sales representatives. *Id*. As part of the restructuring process, Watson informed

Tourangeau and Toolan that Nappi planned to eliminate their salaries and that their compensation would be based entirely on commissions and incentives like all other southern Maine wine salespeople. App. at JA1098-99.

After numerous discussions with Tourangeau about the elimination of her salary, Nappi agreed to reduce her salary by only fifty percent, and to do so in phases. App. at JA1099-1100. As of the time of trial, only one of those phased reductions had been implemented, in part due to the pandemic crisis and this litigation. App. at JA1101-02. By contrast, Toolan's base salary was simply eliminated. *Id*. While working for Nappi, Tourangeau never earned less than $72,000 a year for a full year's work, and her compensation since the first incremental salary reduction was almost $83,500 in 2019, almost $84,000 in 2020 (during which Nappi actually subsidized her income to offset the effects of COVID-19 on wine sales), almost $94,000 in 2021, and about $95,600 in 2022. App. at JA550-51; Def's Exh. 4.

Throughout her continuing employment with Nappi, Nappi compensated Tourangeau for her work according to Nappi's policies and the terms of her employment. App. at JA922; JA926; JA938; Def's Exhs. 4 & 54. Tourangeau was not aware of any male wine sales representatives hired after her who were compensated better than her, nor was she aware of any new wine sales representatives hired since 2014 who received a three-percent commission. App. at

JA640-42. Tourangeau testified she was not aware of any similarly situated employees at Nappi being paid differently solely based on sex. App. at JA641.

In her Complaint, Tourangeau alleged a variety of claims arising out of her employment with Nappi including: violation of the EPA (Count I); retaliation in violation of the EPA (Count II); violation of the PDA (Count III); sex-based discrimination in violation of Title VII (Count IV); quid pro quo sexual harassment in violation of Title VII (Count V); violation of the MHRA (Count VI); violation of the MTFPWL (Count VII); quantum meruit (Count VIII); and unjust enrichment (Count IX). App. at JA24-42.

By an order dated November 29, 2022, the District Court granted Nappi summary judgment on Count V. ECF No. 106, at 143.

With the consent of the parties, Magistrate Judge John Nivison presided over jury selection on February 6, 2023, in preparation for a jury trial of the claims that survived summary judgment. App. at JA13. The District Court (Woodcock, J.) conducted a jury trial from February 27, 2023 to March 3, 2023. App. at JA16-17. At the conclusion of trial, the jury returned a verdict in favor of Nappi on all claims. Add. at 1-4.

## II.     Pertinent Proceedings at Jury Selection

The District Court asked prospective jurors to complete a written juror questionnaire prior to jury selection. ECF No. 139. As the record of proceedings

reflects, "the parties and the Court agreed that a yes response to questions seven and eight [on the questionnaire] would be automatically disqualifying." App. at JA141. Prior to jury selection, Magistrate Judge Nivison excused all jurors who answered in the affirmative to either or both of those questions. *Id*.

During the course of jury selection, Juror No. 89 answered "yes" to the following query: "Have you ever been party to a lawsuit either as a plaintiff, that is the person bringing the lawsuit, or the defendant and the person against whom your lawsuit was asserted?" App. at JA99-100. In response to follow-up inquiry by Magistrate Judge Nivison, Juror No. 89 stated that twenty-two years ago, while he was employed in Louisiana as an emergency room physician, the family of a young woman who died as a result of injuries from a car accident sued him. App. at JA100-01. The family dropped the lawsuit prior to trial. *Id*. Juror No. 89 conceded that being accused of something made the litigation experience personal, although he noted that his prior experience "wouldn't necessarily pertain to this case." App. at JA101-02. When pressed by the Magistrate Judge about his ability to be fair and impartial, the following colloquy occurred:

> THE COURT: Do you think that would in any way affect your ability to evaluate the evidence, and if the plaintiff was able to prove her case, based on the law and the facts that you found, would you have any difficulty ruling in favor of the plaintiff?
>
> JUROR 89: Not necessarily, I don't think I would, no.

THE COURT: Okay. The only thing that gives me hesitancy is when you say not necessarily. Is there something that caused you to have some hesitancy or that -- that maybe there is something lingering there that could -- could affect that assessment?

JUROR 89: No, sir, no.

THE COURT: Okay.

JUROR 89: I think that's just a figure of speech.

THE COURT: Figure of speech.

JUROR 89: Right.

THE COURT: Okay. So you're confident -- again, not putting words in your mouth, I'll ask it more in a direct way. Are you confident that if you were seated as a juror that both sides would have the opportunity -- a fair opportunity before you, that is you would evaluate the evidence and decide the case on the merits?

JUROR 89: Yes, I do.

App. at JA102-03. In response to Tourangeau's follow-up questions, Juror No. 89

confirmed that his experience being sued did not leave him with a predisposition

about the legitimacy of lawsuits:

MS. QUINLAN: And did -- did that experience make you feel like there are too many frivolous lawsuits or too many people filing lawsuits that have no merit?

JUROR 89: It did not. I didn't think that that case was frivolous. I think it was more a reaction of like a – the anger reaction by the family of a – of a grieving family, which I can't say I wouldn't feel myself if I was in that same situation, so I didn't think that case was frivolous.

App. at JA104.

8

Tourangeau asked the Magistrate Judge to strike Juror No. 89 for cause, arguing that because he indicated that the lawsuit was personal for him, he could not be an impartial juror. *Id*. Nappi opposed Tourangeau's request, noting that Juror No. 89 stated unequivocally that he could be fair and impartial and that Tourangeau's own questioning established that his experience with litigation twenty-two years ago did not leave him with any predispositions about the legitimacy of lawsuits. App. at JA103. The Magistrate Judge determined that Juror No. 89 could be a fair and impartial:

> THE COURT: Yeah, I mean I – I understand the concern any time somebody has been a party to a lawsuit – particularly a defendant if you're the plaintiff, and the plaintiff if you're a defendant – that that experience could have some impact. I think this juror, however, has directly responded to those concerns.
>
> And I, too, was struck by his last response when [Tourangeau's counsel] asked him directly about the – whether this caused him to kind of view the civil justice system in a negative way or in a negative light and that too many lawsuits are filed, and despite the fact that he felt he had done his job and he understood why the lawsuit was brought. I don't think he harbors any bitterness towards – he didn't express any bitterness toward the – the plaintiff or the system. He – in response to my questions about being fair to both parties, I mean I thought he answered that directly and appropriately if he is going to remain. So I understand the concerns, and I'm going to overrule the objection, and Juror 89 will remain in the pool and he can return to his seat.

App. at JA105-06. After that ruling, Tourangeau asked Juror No. 89 some additional questions concerning his knowledge of pending litigation against his employer, Northern Light Health Care. App. at JA106-08. The juror did not have

any personal involvement in any of the lawsuits and knew little about them. *Id*. Although he stated he thought he read an article about an equal pay act lawsuit that had been filed against one of Northern Light's locations in another part of the state, he had not formed any opinions about the validity of that lawsuit, stating: "I don't think I could. I don't know enough about it." App. at JA108. Notably, Tourangeau did not ask to have Juror No. 89 stricken for cause based on his responses to the Northern Light litigation questions. App. at JA108.

Juror No. 14 answered "yes" to three questions on the written juror questionnaire: questions one, four, and six.[1] App. at JA112. In response to inquiry from Magistrate Judge Nivison about question one, Juror No. 14 stated that "[o]ne of my first jobs I was promoted into a management position and there was a young man who was hired after me who was ranked underneath me who I found out later on had been paid more from his hire date." App. at JA113. She stated that she complained about the pay disparity to her supervisor and that the only response she ever received was "there is a certain way that things are done." App. at JA113-14.

---

[1] Those questions were as follows:

    1. Have you or an immediate family member ever experienced discrimination based on sex or gender?

    4. Have you been involved in the discipline of an employee or determining the compensation to be paid to an employee?

    6. Have you ever observed a person experience what you believe was discrimination in the workplace based on sex or gender?

ECF No. 139, at 1-2.

Juror No. 14 stated that she found her employer's response to her complaint about pay disparity unsatisfactory. App. at JA118. She further testified that the disparity in pay continued until she left that employment in 2014. App. at JA113.

In response to inquiry from Magistrate Judge Nivison about question four, Juror No. 14 stated that in her current employment position her supervisor's boss had discriminated against her supervisor on the basis of sex. App. at JA114. Juror No. 14 specified that she witnessed her supervisor's boss discriminating against her supervisor on the basis of sex through microaggressions. App. at JA114-15. Finally, in response to an inquiry from Magistrate Judge Nivison about question six, Juror No. 14 stated that she had disciplined employees up to and including dismissal. App. at JA115.

Magistrate Judge Nivison explained to Juror No. 14 that the claims in this case involved allegations of sex discrimination, including discrimination based on pay. App. at JA116. After initially indicating that she did not think her past experiences with discrimination and unequal pay would affect her ability to assess the merits of the case and render an objective, neutral decision, the following colloquy occurred:

> THE COURT: Do you believe that you would be predisposed one way or another to look at the case in a certain way based on your own experiences?

> JUROR 14: I don't think so. I can't say that for sure, though.

11

THE COURT: Okay, why can't you say it for sure? I understand your hesitancy, but why can't you say it for sure?

JUROR 14: I think I would be more likely to lean towards someone who is being undercompensated, and given the political climate, given my own experiences, I – I would be more likely to lean that way.

App. at JA117. Nappi's counsel noted on the record that Juror No. 14's response to the first question in the above-quoted sequence was preceded by a lengthy pause. App. at JA119.

Consequently, Nappi asked the Court to strike Juror No. 14 for cause. *Id*. Nappi highlighted the lengthy pause before Juror No. 14 admitted that she could not say for sure whether her own experiences would predispose her one way or the other. *Id*. It also repeated Juror No. 14's admission that she "would be more likely to lean towards someone who is being undercompensated" given her own experiences. *Id*. Finally, Nappi noted that Juror No. 14's pay disparity issue occurred less than ten years ago. *Id*. Although Tourangeau opposed Nappi's request, Magistrate Judge Nivison sustained Nappi's objection based on the following reasoning:

Again, with this juror I don't question her intentions here at all. I do think that she answered honestly when she expressed some hesitancy and then ultimately said that she'd probably lean toward the plaintiff. Now, one way of interpreting that, I understand, is that if the plaintiff proves her case that she would lean that way, I understand that. But a principle claim here by the plaintiff is that she was paid less than a male in a similar role or less than she should because of her gender. This juror believes she was paid less than a male because of her gender. And I understand it was 2014, which was some eight, nine

years ago, but that experience -- given that experience, I'm not surprised to hear her kind of hesitate in some of her answers and ultimately describe it as leaning toward.

So I just think there is enough similarities here that give me pause and I think it's appropriate that she be released and excused, so I'm going to sustain the objection.

App. at JA120-21.

Finally, Magistrate Judge Nivison rejected Tourangeau's attempt to equate

Juror No. 89's situation with that of Juror No. 14. App. at JA121-22. When

Tourangeau referred to Juror No. 89 after Magistrate Judge Nivison indicated that

he was striking Juror No. 14 for cause, the following colloquy occurred:

THE COURT: I'm not going to compare one juror to the next. The juror that was sued that's seated has nothing to do with employment, nothing to do with disparate pay allegation, nothing to do with what is perceived to be unequal. So the fact that there is a lawsuit filed against somebody is a separate issue from whether there are experiences similar to the plaintiff in this case or a party in this case, that's really the distinction.

I cut you off, so I'm sorry, so make sure – make sure you get on the record, Ms. Quinlan, everything you want to say. I – I get it, so feel free to share the –

MS. QUINLAN: No, no worries, that's okay. That's all right.

THE COURT: No, I – I do understand, and, believe me, as I weigh these rulings I am aware of how one ruling may affect another ruling, or be perceived, and I think it's understandable that you point out the distinction that you point out. I just see this as too close to the plaintiff's actual claim, the substance of pay and differential disparate pay based on gender which unfortunately it sounds like the juror was – the juror experienced herself, and for that very direct similar experience to what the plaintiff is claiming I would be surprised if it

didn't impact how she saw the evidence, frankly. I think it would be understandable; I think her hesitation reflects that. But I certainly acknowledge why you are pointing to the physician juror having been a party to a lawsuit yet staying in the pool. I understand, but I just see a distinction in terms of the substantive claim –

MS. QUINLAN: Sure.

THE COURT: -- and these are line drawings that aren't always perfect. But --

MS. QUINLAN: Sure.

THE COURT: -- your objection is noted and I understand. I just want to make sure you had felt you had fair opportunity just to voice it, and if you would like to add to it -- the objection, I would give you that opportunity.

MS. QUINLAN: No. No, thank you, Your Honor.

*Id*.

Despite vocalized concerns about Juror 89, Tourangeau did not utilize her peremptory challenges to strike Juror 89. App. at JA132. After the parties exercised their peremptory challenges, Magistrate Judge Nivison asked the parties if the jury was satisfactory. App. at JA133. Both parties indicated that it was. *Id*. Before empaneling the jury, the Magistrate Judge asked Tourangeau if there were any issues she wanted to raise. App. at JA133-34. Tourangeau indicated there were none. *Id*. Notably, Tourangeau did not object to the jury on the grounds that it violated her constitutional rights, nor did she raise any objection to Nappi's use of its peremptory challenges. App. at JA133-37.

After empaneling the jury, the Magistrate Judge again confirmed with the parties that they were satisfied with the jury. App. at JA134. Finally, before excusing the jury for the day, the Magistrate Judge again confirmed with the parties that the jury was satisfactory and that they had no other issues with regard to the jury. App. at JA137.

### III.    Evidence of Nappi's EPA Affirmative Defenses

It was undisputed that no new wine sales representatives hired by Nappi since 2014 have been compensated at a three-percent commission rate. App. at JA642; JA907-08. To the contrary, the trial evidence established that all new wine sales representatives hired by Nappi since 2014 – regardless of their sex – have been compensated at a two-percent commission rate. App. at JA907-08. The trial evidence also showed that Nappi decided to transition to a two-percent commission rate for new wine sales representatives before Tourangeau ever applied for a position at Nappi. App. at JA663; JA906-07. It was further established that the move to a two-percent commission rate for new wine sales representatives was part of Nappi's effort to "cap" the amount it was spending on wine sales representatives. App. at JA667.

Nappi Human Resources Director Christine Fox testified that the move to a two-percent commission rate for new wine sales representatives was intended to bring the overall compensation in the wine department down over time to a

realistic level as compared to compensation within Nappi and within the beverage industry. App. at JA871-72. She further testified that Nappi's compensation for wine sales representatives stood out as inflated when compared to distributors both in the Northeast and nationally. App. at JA871-72; 907. Fox also testified that the reduction of the wine sales commissions to two percent helped to offset increased costs for fuel, energy, product, shipping, technology, additional support staff, and other operating costs. App. at JA875; 907. Fox also noted that the "SevenFifty report" Tourangeau had sent to Nappi Wine Sales Director Matt Watson contained survey information that supported and "validated" what Nappi was doing with regard to reducing compensation of wine sales representatives. App. at JA880-81.

Fox testified that the reasons existing wine sales representatives were kept at three-percent commissions when Nappi adopted the new rate was attributable to their seniority at Nappi, their experience in wine sales, and their role in driving sales for Nappi. App. at JA872. She elaborated on those considerations as follows:

> Q. Okay. And did you have an understanding as to why Nappi kept those individuals at a three percent rate?
>
> A. Yeah, I mean they -- as I talked previously a couple of times about the long tenure, the long seniority that they've had, they were performing very well for us. We want – Frank wanted to keep them, he did not want them to leave the company, you know, so the decision was made that we were going to keep them at the three percent and as they – like the – one of the retirements is Steve Cohen, when he retired and we – his replacement is Matt Auger, Matt took over at two percent.

Q. Okay. So I think you're indicating Frank Nappi wanted to retain these people, their tenure for the company and experience was important to him?

A. Very.

Q. Okay.

A. To all of us.

App. at JA911.

Nappi President Frank Nappi, Jr., also addressed the company's decision to offer two-percent commissions to all new wine sales representatives starting in 2014. On that issue, Frank Nappi, Jr. testified as follows:

Q. And who was responsible for the decision to go from three percent to two percent?

A. Ultimately my decision.

Q. Okay. And why did you decide to make that change to go to two percent for the new wine sales representatives?

A. It – three percent is not sustainable, not for a long period of time. With wine our margins are not huge and over time they've – they've shrunk. So we make a lot less money so there is a lot less to pass on.

App. at JA977. He further indicated that Nappi was trying to bring the wine sales representatives' compensation within a range so that the company could support that compensation. App. at JA982.

Frank Nappi, Jr., also explained why he retained the existing wine sales representatives at three percent. In that regard, he testified:

Q. Okay. You also were asked some questions about -- or I believe the existing wine sales representatives were kept at three percent commission; is that right?

A. The ones with long tenure, yes.

Q. Okay. And why did you keep those at three percent?

A. Selling a wine sales route takes – takes a lot of work. You need to develop relationships with your accounts to get, you know, most of their business. You know, instead of having three bottles on the shelf, you want six bottles on the shelf or 12. You want all their business, and it takes a while to – to grow that. And if you – if you – if a salesperson that's been there for 20 years, you break down their commission rate from three to two and they decide to leave, it will take a very long time, perhaps a year, two years, to develop that route again.

Q. Okay. So it was the – you valued their – their tenure and seniority with regard to those type of – of activities?

A. Yes.

App. at JA977-78.

## IV.   Jury Instructions

On the fourth day of trial, the District Court reviewed the proposed jury instructions with the parties. With regard to Nappi's affirmative defenses under the EPA, the District Court proposed the following instruction:

What -- what it now says -- I think we can continue with the discussion. What it says is Nappi -- if you find Ms. Tourangeau has proven her claim, and this is under the Equal Pay Act, you will then consider Nappi's -- Nappi Distributors' defenses. Nappi has asserted that any difference in pay between Ms. Tourangeau and male workers are due to differences in their seniority, to application of the merit system to quantity or quality of production, and/or to a business

decision such as adjusting its payroll to reflect the industry standards not based on gender. On these affirmative defenses Nappi bears the burden of proof to demonstrate its affirmative defenses are more likely than not true or not.

App. at JA1029-30. Tourangeau conceded during the discussion of the proposed EPA instruction that, "I think they're entitled to the affirmative defense on the idea that this was a business judgment or another factor as we talked about initially…." App. at JA1028. The District Court further noted that "the [defense] that clearly has been generated is business decisions such as adjusting its payroll to reflect industry standards not based on gender." App. at JA1030. When the District Court confirmed that it intended to instruct the jury on the "quantity or quality of production" defense and the business decision unrelated to sex defense, Tourangeau did not object. App. at JA1030-31.

This colloquy was reinforced during the discussions the District Court had with the parties regarding the proposed jury verdict form. In that context, Tourangeau sought to ensure that "the affirmative defense language [in the verdict form] tracks the discussion we've already had about seniority system, merit based, et cetera." App. at JA1066. The District Court confirmed that the inquiry on the verdict form pertinent to Nappi's EPA defenses would conform to the instructions generated by the evidence:

> We'd have to eliminate -- so we're – we're really talking -- this talks about bona fide seniority system, and we have -- and depending on the information you give me I may or may not include seniority system,

we're striking merit system. And then we need to infuse and/or
business decision.

App. at JA1066-67. Tourangeau confirmed that she did not have any further issues

with the EPA defense question on the proposed verdict form. App. at JA1067.

On the final day of trial, the District Court discussed with the parties its

decision with respect to instructing on a bona fide seniority system as an

affirmative defense to the EPA claim. App. at JA1175-76. Importantly, the District

Court distinguished between a bona fide seniority system and the term

"grandfathering" as used consistently at trial, indicating it would incorporate

grandfathering within the parameters of the business-related affirmative defense.

App. at JA1176. The discussion was as follows:

> THE COURT: Let me talk about seniorities and affirmative defense
> under the Equal Pay Act. I looked at AT&T versus Hulteen, H-U-L-T-
> E-E-N, which is 556 U.S. 701, and this quotes California Brewer's,
> which is 444 U.S. 598, a 1980 case. And it says here, a seniority
> system is a scheme that, alone or in tandem with non-seniority
> criteria, allots to employees ever-improving rights and benefits as
> their relative lengths of employment increase. That's not what
> happened here. It's just not what happened here. This is – Nappi's
> change was grandfathering. It wasn't a bona fide seniority system in
> which you get ever-improving rights and benefits as your relative
> length of employment increases. So I'm not going to instruct on -- on
> seniority.
>
> MR. WALL: I understand our objection is on the record.
>
> THE COURT: Sure.

MR. WALL: I mean, Your Honor, if it's incorporated within the sort of parameters of the fourth provision that grandfathering is a – business-related rationale that's not related to sex –

THE COURT: No, you can argue that, but I'm talking about your – your request that I instruct the jury on seniority as an affirmative defense. I don't think you have met it.

App. at JA1175-76. The District Court further ruled that Nappi could use the term "seniority" in the colloquial fashion in closing, as the evidence established these individuals had seniority and tenure with Nappi. App. at JA1180. Tourangeau did not object to that ruling. *Id*.

Also on the last day of trial, the District Court declined to include language requested by Tourangeau relative to her EPA claim. Specifically, Tourangeau asked the District Court to include the following jury instruction that she represented was drawn from *Corning Glass Works v. Brennan*, 417 U.S. 188 (1974):

If you find that Nappi's has proven their defense, that the decision to pay Ms. Tourangeau was based on a neutral factor other than sex, but that it nevertheless operated to perpetuate the effects of the company's prior illegal practice of not hiring women for the sales representative positions, then you must find in Ms. Tourangeau's favor.

ECF No. 142, at 12. After reviewing the facts and holding of *Corning*, the District Court denied the request:

What I -- what I see <u>Corning</u> as saying is that if an employer's prior discriminatory practice is baked into its wage structure, even after it changed its wage structure, a company's insistence that it change its

wage structure neutrally doesn't eliminate its prior discrimination. That's the way I read it.

So I don't think that's what happened here under any scenario because Ms. Tourangeau was the first woman hired. So there is no evidence that Nappi paid women sales representatives less before it hired Ms. Tourangeau because Ms. Tourangeau was the first woman, so there is no indication that any of its prior practice was baked into what it did here. This was a new practice, which you claim, I think the jury will decide, was discriminatory. But it's not a function of -- it's not a wage structure that was baked into its current structure for which it's now offering a neutral reason. So the bottom line is I don't think <u>Corning</u> applies and I'm not going to give the instruction.

App. at JA1174-75.

After the close of evidence, the District Court instructed the jury on the EPA claim, including Nappi's defenses. With regard to the latter, the District Court told the jury:

If you find that Ms. Tourangeau has proven her claim, you will then consider Nappi's defenses. Nappi has asserted that any differences in pay between Ms. Tourangeau and male workers are due to quantity or quality of production and/or to a business decision, such as adjust its payroll to reflect industry standards not based on gender. On these affirmative defenses, Nappi bears the burden of proof to demonstrate its affirmative defenses are more likely true than not.

App. at JA1253.[2] In addition, the District Court reviewed the verdict form with the jury:

---

[2] The transcription of the Court's oral jury instructions did not capture the comma after "standards" that appears in the Court's written instructions – i.e., "a business decision, such as adjust its payroll to reflect industry standards, not based on gender." However, Nappi believes the Court conveyed that comma through its inflection when it read the instruction.

Two. This is the affirmative defense. Has Nappi Distributors proven, by a preponderance of the evidence, that the differential in pay between Ms. Tourangeau and the comparable male employee, or employees, was due to quantity or quality of production and/or to a business decision such as adjusting its payroll to reflect industry standards, not based on gender? Yes or no.

App. at JA1268.

Tourangeau addressed the EPA affirmative defenses in her closing. In discussing the preponderance of the evidence standard and how it applied to Nappi's defenses, she stated:

The same is true for affirmative defenses. So if Nappi is able to prove that the only reason they did what they did when it comes to Michele's compensation, the only reason was business necessity, and you put those facts on the same scale and it tips ever so slightly in their favor, then you would find for them on that affirmative defense.

App. at JA1290.

Finally, after the parties presented their closing statements, the District Court met with them at sidebar prior to committing the case to the jury. During that sidebar conference, the District Court confirmed with Tourangeau that she did not have any objections to the jury instructions other than those the District Court had already resolved, and she had no additions to the instructions. App. at JA1326.

## V. Juror Conduct

Juror No. 161 responded in the negative to all questions on the printed juror questionnaire, including the following:

7. The law protects against discrimination of individuals with certain medical conditions, including a woman's pregnancy. Do you have any strong feelings or philosophical beliefs about such laws that might interfere with your ability to be fair and impartial in a case in which the laws might apply?

8. Do you have any strong personal feelings or philosophical beliefs about an individual's ability to bring a lawsuit to recover money damages that might interfere with your ability to be a neutral impartial decision-maker in a case in which a person is seeking money damages?

App. at JA053; ECF No. 139, at 2. None of the prospective jurors stood in response to the Magistrate Judge's question: "Do you believe that there are any circumstances under which a man and a woman, with the same experience, education, and seniority, should be paid a different wage for performing the same job?" App. at JA048.

Before the fourth day of trial, Tourangeau moved to disqualify Juror No. 161. In part, she argued that "it appears" Juror No. 161 lied in his responses to the written juror questionnaire based on his "Facebook interests." ECF No. 186, ¶ 5. In support of that assertion, she represented that Juror No. 161 "is part of a secret Facebook group called #FEDUP." ECF No. 186, ¶ 9. However, Tourangeau presented nothing of evidentiary quality to substantiate that there is a "Facebook group," or that the "group" is secret, or that Juror No. 161 is "part" of a "secret group." Rather, at most she represented to the Court that Juror No. 161 "liked" a Facebook page called "#FEDUP" she suggested (again, without any evidentiary support) contains a statement about "how we can come together for change and

resistance against the liberal/ democratic/socialist agenda." ECF No. 186, ¶¶ 9-10.

She further suggested that the alleged Facebook page "appears distinctly opposed

to the rights of women and all other minority groups" – although she provided no

specific evidentiary information to substantiate that characterization. ECF No. 186,

¶ 10. Finally, she suggested that based on Juror No. 161's "participation" in this

"Facebook group," it was clear that Juror No. 161 lied in his responses to questions

7 and 8 quoted above. ECF No. 186, ¶ 5.

In her motion to disqualify, Tourangeau also suggested that her counsel

observed Juror No. 161 rolling his eyes and exhibiting "obvious distain" for her

testimony. ECF No. 186, ¶ 8. She further suggested that her counsel heard Juror

No. 161 making "biased utterances" during her testimony – although she never

indicated the substance of those utterances – and "scoffing" at and disregarding

testimony about Frank Maiorino. *Id*. There is nothing of evidentiary quality to

substantiate any of those allegations, nor did Tourangeau suggest how she knows

Juror No. 161 "disregarded" any specific piece of testimony.

In her reply in support of her motion, the materials Tourangeau submitted –

which were themselves unauthenticated – did not substantiate most of the

assertions in the motion. The documents did not reflect that Juror No. 161 was part

of or participated in a "secret Facebook group," nor did they establish that the

Facebook page Juror No. 161 apparently "liked" was opposed to the rights of

women and all other minority groups. Tourangeau provided the District Court with no information as to when the page was formed, when Juror No. 161 supposedly liked the page, or when Juror No. 161 supposedly last visited the page. Moreover, Tourangeau presented no statements or other evidence that Juror No. 161 either saw, liked, agreed with, or adopted any particular post on that Facebook page. In particular, Tourangeau did not identify any posts about: one, employment discrimination laws in particular or rights of persons with certain medical conditions in general; or two, an individual's ability to bring a lawsuit to recover money damages.

Finally, Tourangeau never presented any specific evidence – as opposed to unsubstantiated generalities – of Juror No. 161's supposed utterances, scoffs, glares, frustrated sighs, and body language. To the contrary, Tourangeau relied entirely on the unverified and ambiguous representations of counsel.

When the District Court reviewed Tourangeau's motion with the parties, Tourangeau conceded that she did not know when Juror No. 161 liked the Facebook page. App. at JA1230. The District Court asked Tourangeau: "do we know from the fact he liked it what it was he liked about it?" App. at JA1232. Tourangeau could not identify any facts to answer the District Court's question, only speculation and broad generalities by counsel concerning "people who follow these types of accounts on Facebook," which the District Court properly rejected:

> THE COURT: Well, I mean I hear you, but there is really no evidence of that. I hear what you're telling me, but I don't – I'm not so sure that there is evidence of that.

App. at JA1232. Moreover, as Nappi pointed out, there was nothing on Juror No. 161's personal Facebook page that suggested he liked or shared any posts from "#100percentFEDUP" and no evidence to support the conclusion that simply liking a Facebook page means that a person agrees with or adopts everything that might be posted by others on that page. App. at JA1233-34. And contrary to Tourangeau's speculation about Juror No. 161's views, his own posts on Facebook about women and pregnancy were limited to sporting groups that included men and women and a picture of the juror with his wife and their new baby. App. at JA1234.

The Court denied the motion to disqualify. First, the District Court indicated that Tourangeau had failed to demonstrate a colorable instance of potential juror bias because there was no evidence that Juror No. 161 lied in responding to questions 7 and 8 of the juror questionnaire:

> My view of this is first that questions seven and eight do not ask the juror to reveal facts. They ask the juror to reveal his opinions and they ask his opinion about whether or not he could be fair and impartial in those two types of cases.
>
> So I don't -- he -- he said that -- he responded that in his view he would not be biased, effectively, and that's different than French. … So I see this – it's hard to delve into an opinion about one's own ability to be fair and impartial and conclude, unlike in French, that there -- that the juror has lied.

> Second, I mentioned that the first question was whether or not a juror could be fair about a case that involves a medical condition involving pregnancy. I have looked at the website; I don't really see a connection between the website and that question.

> Secondly, question eight asks about a person bringing a lawsuit. It's not specific about women. It's not specific about discrimination. It's not specific about unequal pay. So I don't think this is like French in that regard.

App. at JA1239-40. The District Court indicated that to the extent Juror No. 161 liked a Facebook page for 100percentfedup.com, the most he could reasonably infer from the information provided is that Juror No. 161 is a politically conservative person. App. at JA1240. The District Court noted that there was no evidence that Juror No. 161 liked any particular postings or what was in his mind with regard to any particular posting. *Id*. Nor did the District Court think it was fair to infer that a person who liked the page agreed with everything on the page. App. at JA1240-41. The District Court concluded that it would not be fair to infer that a person who liked the website could not be a fair and impartial juror. App. at JA1240.

Finally, the District Court noted that he had been observing Juror No. 161's demeanor since Tourangeau had filed her motion. In that regard, the District Court stated that he could not hear Juror No. 161 and therefore did not know if he had ever "scoffed." App. at JA1242. He also stated that Juror No. 161 would

"occasionally … look up as if he is sort of frustrated," but the District Court went on to state:

> I haven't noticed that he has been doing that at any particular time. In other words, he doesn't look up more when Mr. Wall is asking questions as opposed to the plaintiff asking questions. So I'm not convinced, from what I have seen here, that he has exhibited body language and an attitude that would render him disqualified.

App. at JA1242.

## STATEMENT OF THE STANDARDS OF REVIEW

Tourangeau challenges the District Court's denial of her motion for a new trial on several issues. The Court reviews her assertion that the District Court erred in ruling that the evidence supported the jury's verdict on her EPA claim for abuse of discretion. *Raiche v. Pietroski*, 623 F.3d 30, 41 (1st Cir. 2010). Under that standard of review, the Court takes "both the facts and the reasonable inferences therefrom in the light most hospitable to the jury's verdict." *Poy v. Boutselis*, 352 F.3d 479, 485 (1st Cir. 2003) (alteration in original) (quoting *Correa v. Hosp. S.F.*, 69 F.3d 1184, 1188 (1st Cir. 1995)). As this Court has noted, its review is circumscribed because "[c]ircuit judges, reading the dry pages of the record, do not experience the tenor of the testimony at trial." *Jones ex rel. United States v. Mass. Gen. Hosp.*, 780 F.3d 479, 492 (1st Cir. 2015) (quoting *Jennings v. Jones*, 587 F.3d 430, 436-37 (1st Cir. 2009)). The Court "may set aside a jury's verdict and order a new trial only if the verdict is against the demonstrable weight of the credible

evidence or results in a blatant miscarriage of justice." *Sanchez v. P.R. Oil Co.*, 37 F.3d 712, 717 (1st Cir. 1994).

The Court reviews Tourangeau's assertion that the District Court erred in instructing the jury on her EPA claim *de novo*. *Crowley v. L.L. Bean, Inc.*, 303 F.3d 387, 394 (1st Cir. 2002). "'The trial court's refusal to give a particular instruction constitutes reversible error only if the requested instruction was (1) correct as a matter of substantive law, (2) not substantially incorporated into the charge as rendered, and (3) integral to an important point in the case.'" *Faigin v. Kelly*, 184 F.3d 67, 87 (1st Cir. 1999) (quoting *Elliott v. S.D. Warren Co.*, 134 F.3d 1, 6 (1st Cir. 1998)).

The Court reviews Tourangeau's assertion that the District Court erred in ruling on challenges for cause during jury selection for clear abuse. *United States v. Bartelho*, 71 F.3d 436, 443 (1st Cir. 1995) (citations omitted). Trial courts have "considerable discretion in ruling on challenges for cause." *United States v. Gonzalez-Soberal*, 109 F.3d 64, 69 (1st Cir. 1997) (citing *Dennis v. United States*, 339 U.S. 162, 168 (1950)). Therefore, the Court has emphasized that "[t]here are few aspects of a jury trial where we would be less inclined to disturb a trial judge's exercise of discretion, absent clear abuse, than in ruling on challenges for cause in the empaneling of a jury." *United States v. McCarthy*, 961 F.2d 972, 976 (1st Cir. 1992).

Finally, the Court reviews Tourangeau's assertion that the District Court erred in denying her a new trial based on alleged juror bias for abuse of discretion. *Crowley*, 303 F.3d at 393-94 (quoting *Dall v. Coffin*, 970 F.2d 964, 969 (1st Cir. 1992)). "To secure a new trial based on a juror's inaccurate answers during *voir dire*, 'a party must first demonstrate that a juror failed to answer honestly a material question on *voir dire*, and then further show that a correct response would have provided a valid basis for cause.'" *Id*. at 407 (quoting *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 556 (1984)). The party raising the challenge "'must do more than raise a speculative allegation that the juror's possible bias may have influenced the outcome of the trial.'" *Id*. (quoting *Dall*, 970 F.2d at 969).

## SUMMARY OF THE ARGUMENT

The District Court's denial of Tourangeau's motion for a new trial was proper in all respects. Based on the trial evidence, a rational jury could well have found – and the jury in this case did find – that Nappi proved by a preponderance of the evidence an affirmative defense to Tourangeau's EPA claim. Specifically, the evidence supported the jury's determination that any differences in pay between Tourangeau and other male sales representatives were due to quantity or quality of production or to a business decision – such as adjusting Nappi's payroll to reflect industry standards – not based on gender.

The District Court did not err in instructing the jury on Tourangeau's EPA claim. The District Court's instruction on Nappi's EPA affirmative defenses comported with controlling substantive law and, in any event, Tourangeau waived any objection she had to that instruction. Moreover, the District Court correctly ruled that Tourangeau was not entitled to her proffered "*Corning* instruction" because the evidence at trial did not implicate that instruction.

The District Court did not abuse its discretion in ruling on challenges for cause during jury selection. As the record reflects, the District Court thoroughly examined the pertinent jurors to explore any potential for bias and articulated its reasons for its rulings. Indeed, the District Court specifically and thoughtfully addressed why it excused one juror for cause and not the other. The District Court did not clearly abuse its considerable discretion by those rulings.

Finally, the District Court did not abuse its discretion in refusing to grant Tourangeau a new trial based on her complaints about Juror No. 161. Tourangeau did not present any competent evidence that Juror No. 161 failed to answer honestly a material question on *voir dire*, nor did she present any competent evidence that a correct response would have provided a valid basis for cause. Finally, Tourangeau offered nothing more than speculative allegations that Juror No. 161 was potentially biased or that his potential bias influenced the outcome of

the trial. For all of these reasons, this Court should affirm the District Court's ruling on Tourangeau's new trial motion.

## ARGUMENT

## I. THE TRIAL EVIDENCE SUPPORTED THE JURY'S VERDICT ON NAPPI DISTRIBUTORS' DEFENSE TO TOURANGEAU'S EPA CLAIM.

Contrary to Tourangeau's argument on appeal, the District Court did not abuse its discretion by denying her request for a new trial based on her assertion that the evidence did not support a finding for Nappi on its EPA affirmative defenses. "[C]ourts may only grant a judgment contravening a jury's determination when the evidence points so strongly and overwhelmingly in favor of the moving party that no reasonable jury could have returned a verdict adverse to that party." *Monteagudo v. Asociacion de Empleados del Estado Libre Asociado*, 554 F.3d 164, 170 (1st Cir. 2009) (citations omitted). "As part of this analysis, courts 'may not consider the credibility of witnesses, resolve conflicts in testimony, or evaluate the weight of the evidence.'" *Mesías v. Hosp. Hima San Pablo*, No. 18-1988 (JAG), 2021 U.S. Dist. LEXIS 57090, at *3 (D.P.R. Mar. 24, 2021) (quoting James Wm. Moore, *Moore's Federal Practice* § 50.06[6][b] (3d ed. 2003)). Moreover, this Court has held that "[w]here the trial judge has denied a motion for a new trial on the issue of the sufficiency of the evidence, it is 'only in a very unusual case that we will reverse such a ruling as an abuse of discretion.'" *Raiche*, 623 F.3d at

41 (quoting *Wagenmann v. Adams*, 829 F.2d 196, 200 (1st Cir. 1987) (citations omitted)). As the following discussion demonstrates, this is not that "very unusual case."

### A. Tourangeau waived any objection she may have had regarding submission of Nappi's EPA affirmative defense to the jury.

Tourangeau's primary argument with regard to the sufficiency of the evidence appears to be grounded on the premise that the term "grandfathering" is inexorably synonymous with "seniority system." Blue Br. at 26-27. She argues that since Nappi did not present evidence of a documented seniority system, the jury could not consider "grandfathering" in any other sense in evaluating Nappi's business decision that was not based on gender. *Id*. at 27.

As an initial matter, the Court should hold that Tourangeau waived any argument that the trial evidence could not support Nappi's EPA affirmative defense pertaining to business reasons unrelated to sex based on her failure to object to the District Court's jury instruction and its more general understanding of the concept of "grandfathering." In *Tang v. Citizens Bank*, 741 F. App'x 11 (1st Cir. 2018), this Court held that a party had waived any objection it may have had to the jury instructions if the party allowed the case to be submitted to the jury without an objection on the record. *Id*. at 13 (citing Fed. R. Civ. P. 51(c)(2)(B)). Similarly, in *Ray v. Ropes & Gray LLP*, 799 F.3d 99 (1st Cir. 2015), this Court held that a party that has bypassed the opportunity to challenge and perhaps modify

34

a jury instruction as stated by the court has "'waived any right to object to [it] on appeal.'" *Id*. at 212 (quoting *United States v. Wall*, 349 F.3d 18, 24 (1st Cir. 2003)).

Tourangeau conceded that the trial evidence supported submission of Nappi's EPA defense based on a business decision that had nothing to do with sex to the jury. When the District Court was reviewing the jury instructions with the parties, Tourangeau, through counsel, stated: "I think they're entitled to the affirmative defense on the idea that this was a business judgment or another factor as we talked about initially…." App. at JA1028. The District Court further noted that "the [defense] that clearly has been generated is business decisions such as adjusting its payroll to reflect industry standards not based on gender." App. at JA1030. When the District Court confirmed that it intended to instruct the jury on the "quantity or quality of production" and the business decision unrelated to sex defenses, Tourangeau did not indicate any objection. *Id*.

Likewise, Tourangeau did not object to the District Court's ruling that "grandfathering" – as a more general concept independent of a seniority system – could be considered as part of the business reason unrelated to gender. Before the final day of trial, the District Court advised the parties of its decision with respect to instructing on a bona fide seniority system as an affirmative defense to the EPA claim. App. at JA1175-76. In declining to instruct on the seniority system defense,

the District Court distinguished between a bona fide seniority system and the term "grandfathering," as used at trial, and indicated that it would incorporate grandfathering within the parameters of the business-related affirmative defense. *Id*. The District Court further ruled that Nappi could use the colloquial meaning of the term "seniority" in closing, as the evidence established these individuals had seniority and tenure with the company. App. at JA1180. Tourangeau did not object to any of those rulings by the District Court. *Id*. Therefore, Tourangeau has waived any argument she may have had that the trial evidence could not support a jury verdict for Nappi on that defense, and the Court should affirm the District Court's denial of a new trial on that ground. *See Tang,* 741 F. App'x at 13.

**B. As the District Court correctly held, the trial evidence supported the jury's conclusion that Nappi had proved its EPA affirmative defense.**

Tourangeau contends that the jury's verdict as to Nappi's EPA affirmative defense is contrary to the great weight of evidence because the evidence did not explain how the decision to compensate Tourangeau with a two-percent commission was a business decision unrelated to sex. However, as the District Court discussed in exhaustive detail, her contention is without merit, as there was overwhelming evidence presented at trial for the jury to determine that Nappi's decision was based on business considerations unrelated to sex.

The trial evidence established that all new wine sales representatives hired by Nappi since 2014 – regardless of their sex – have been compensated at a two-

percent commission rate. App. at JA907-08. Moreover, Nappi's decision to move to a two-percent commission rate for new wine sales representatives was made before Tourangeau ever applied to Nappi. App. at JA663-64; 906-07. And, as Nappi explained at trial, the transition was part of Nappi's effort to "cap" the amount it was spending on wine sales representatives. App. at JA667.

Frank Nappi, Jr., Nappi's President and the person who ultimately made the decision to transition to a two-percent commission rate, explained that continuing with a three-percent commission rate in the wine department was not feasible from a business standpoint. App. at JA977. He explained that three percent was not sustainable for a long period of time because Nappi's wine margins were shrinking, causing Nappi as a company to make a lot less money to pass on. *Id.* Consistent with the reality of shrinking margins, Human Resources Director Christine Fox explained that the reduction to two percent helped to offset increased costs associated with fuel, energy, product, shipping, technology, additional support staff, and other rising operating costs. App. at JA875; JA907.

In addition, Fox testified that the move to a two-percent commission rate for new wine sales representatives was intended to bring the overall compensation in the wine department down over time to a realistic level as compared to compensation within Nappi and within the beverage industry. App. at JA871. Fox explained at trial that Nappi's compensation for wine salespeople stood out as

inflated compared to distributors both in the northeast and nationally. App. at JA 871-72; 907. In support of this assertion, Fox cited to the "SevenFifty report" Tourangeau had sent to Wine Sales Director Matt Watson, which contained survey information that supported and validated what Nappi was doing with regard to reducing compensation of wine sales representatives. App. at JA880-81.

Furthermore, there was sufficient evidence at trial for the jury to conclude that Nappi's decision to "grandfather" its existing wine sales representatives was based on business reasons unrelated to sex. At trial, the evidence established that Nappi's adoption of a two-percent commission rate for new wine sales representatives after 2014 would not apply to existing wine sales representatives, who would maintain their current three-percent commission rates. App. at JA872; 977-78. Thus, when the term "grandfathering" was used at trial, it was used in its colloquial sense to describe this arrangement whereby Nappi essentially drew a line in the sand – all wine sales representatives hired before 2014 would maintain their current commission rate and all those hired after 2014 would be hired at the two-percent rate. And, through attrition, the "three-percenter" would eventually be replaced with "two-percenter."  App. at JA911. Notably, the evidence established that Nappi had applied this rule consistently and indiscriminately to all new wine salespeople since 2014.

Nappi explained its decision to "grandfather" the existing wine sales

representatives was based on numerous factors, none of which related to sex. Nappi explained at trial that the existing sales representatives had established positions and tenure at Nappi, significant experience in wine sales, were doing very well for the company, and played a major role in driving sales for Nappi. App. at JA872. Frank Nappi, Jr., expounded that relationships with accounts that are developed over time are an important aspect of wine sales and that Nappi valued the relationships the existing sales representatives had with their accounts. App. at JA977-78. Moreover, Nappi feared that decreasing the commission rates for its existing salespeople would cause Nappi to lose the experienced, knowledgeable, and loyal salespeople it had. *Id*. Therefore, there was more than sufficient evidence at trial for the jury to conclude that Nappi had proven its affirmative defense to the EPA claim and this Court should affirm that decision.

Finally, Tourangeau's contention that the evidence at trial did not support grandfathering – in its naturally understood sense – distinct from a bona fide seniority system as an affirmative defense to the EPA claim lacks credibility. Indeed, the District Court noted that this argument was "borderline frivolous." Add at 41. As the District Court correctly reasoned, it was Tourangeau – not Nappi – that first introduced the term "grandfathering" to the jury, suggesting in her opening that Nappi was going to claim that "[Tourangeau's] colleagues are grandfathered into their higher rates while she is not." App. at JA168.

Tourangeau's counsel told the jury they would be hearing the term "grandfathering" a lot this week, and then went on to compare Nappi's use of grandfathering in compensation decisions to the South's historic repression of African Americans. App. at JA168-69. Neither Tourangeau in her opening, nor Nappi in explaining how the concept of "grandfathering" factored into its compensation decisions, used or understood the term to refer to (or be synonymous with) a bona fide seniority system. For these reasons and for those outlined above, the Court properly permitted Nappi to argue that "grandfathering" fell within the purview of the fourth "catch all" affirmative defense to the EPA, and there was more than sufficient trial evidence for the jury to reasonably conclude that Nappi's decision to grandfather certain employees and not others was a business decision unrelated to sex.

## II.     THE TRIAL EVIDENCE DID NOT SUPPORT TOURANGEAU'S PROFFERED "*CORNING* INSTRUCTION."

Tourangeau argues on appeal that the District Court erred in refusing to give the jury a proposed instruction ostensibly based on *Corning Glass Works v. Brennan*, 417 U.S. 188 (1974). Specifically, Tourangeau asked the District Court to instruct the jury as follows:

> If you find that Nappi's has proven their defense, that the decision to pay Ms. Tourangeau was based on a neutral factor other than sex, but that it nevertheless operated to perpetuate the effects of the company's prior illegal practice of not hiring women for the sales representative positions, then you must find in Ms. Tourangeau's favor.

Add. at JA83. The District Court properly declined to give the proposed instruction because it does not accurately state the law and it was not justified by the trial evidence. In any event, the District Court's EPA instruction in its totality adequately informed the jury as to the controlling substantive law.

This Court has held that "[a] trial court is obliged to inform the jury about the applicable law, but, within wide limits, the method and manner in which the judge carries out this obligation is left to his or her discretion." *Elliott v. S.D. Warren Co.*, 134 F.3d 1, 6 (1st Cir. 1998). The Court has further stated that "the real test is whether as a whole 'the instructions adequately illuminate the law applicable to the controlling issues in the case without unduly complicating matters or misleading the jury.'" *Rosa-Rivera v. Dorado Health, Inc.*, 787 F.3d 614, 620 (1st Cir. 2015) (citing *United States v. DeStefano*, 59 F.3d 1, 3 (1st Cir. 1995)). "A refusal to give a particular instruction constitutes reversible error only if the requested instruction was (1) correct as a matter of substantive law, (2) not substantially incorporated into the charge as rendered, and (3) integral to an important point in the case." *Estate of Keatinge v. Biddle*, 316 F.3d 7, 17 (1st Cir. 2002) (citing *Elliott*, 134 F.3d at 6). In discussing this standard, this Court has stated that "[t]he district court should refuse a request for an instruction that states a legal holding which is not applicable to the facts, even if it is otherwise

correct." *Id.* (citing 9A C.A. Wright & A.R. Miller, *Federal Practice and Procedure* § 2552 (2d ed. 2002)).

None of the elements of reversible error exist with regard to the District Court's refusal to include the language quoted above in the jury instructions. First, *Corning* does not stand for the proposition in Tourangeau's requested instruction. In *Corning*, the EPA violation was based on the fact that, after Congress passed the EPA, Corning paid female inspectors less than male inspectors for equal work. *Corning*, 417 U.S. at 207. Regarding Corning's argument that it cured this inequality by making changes to its pay structure moving forward, the Supreme Court held that this measure did not relieve Corning of responsibility under the EPA because it did not address the historical *unequal pay* based on sex:

> We therefore conclude that on the facts of this case, the company's continued discrimination in base wages between night and day workers, though phrased in terms of a neutral factor other than sex, nevertheless operated to perpetuate the effects of the company's prior illegal practice of paying women less than men for equal work.

*Id.* at 209-10 (citing *Griggs* v. *Duke Power Co.*, 401 U.S. 424, 430 (1971)). In short, the Supreme Court's decision in *Corning* turns not on alleged historical discriminatory treatment generally,[3] but rather on a historical "practice of *paying women less than men for equal work*." *Id.* (emphasis added). Therefore, *Corning*

---

[3] The Supreme Court in *Corning* observed that the EPA's specific purpose was to address *wage inequality* based solely on sex. *Id.* at 195.

does not support Tourangeau's proposed language, which refers to "the company's prior illegal practice of not hiring women for the sales representative positions"[4] and not to a prior practice of paying women at a different rate than men to work as wine sales representatives.

Second, the pertinent portion of the *Corning* decision is not implicated by the trial evidence. Tourangeau did not present any evidence that Nappi had a practice of paying women at a different rate than men to work as wine sales representatives prior to its decision to compensate new wine sales representatives with two-percent commissions. Moreover, the testimony established that all new wine sales representatives hired since 2014 – beginning with Tourangeau – have received two percent commissions, regardless of their sex. App. at JA907-08. Consequently, as the District Court correctly observed in denying Tourangeau's requested instruction, the Supreme Court's reference in *Corning* to a "prior illegal practice of paying women less than men for equal work" has no relevance to the issues in this case:

> So there is no evidence that Nappi paid women sales representatives less before it hired Ms. Tourangeau because Ms. Tourangeau was the first woman, so there is no indication that any of its prior practice was baked into what it did here. This was a new practice, which you claim, I think the jury will decide, was discriminatory. But it's not a function

---

[4] Nappi did not engage in an alleged prior illegal practice of not hiring women for the sales representative positions. Indeed, the jury found Tourangeau had not proven that Nappi had discriminated against her on the basis of sex. Add. at 2 (question 6). Therefore, even on its own terms, Tourangeau's proposed instruction was unsupported.

of -- it's not a wage structure that was baked into its current structure for which it's now offering a neutral reason. So the bottom line is I don't think Corning applies and I'm not going to give the instruction.

App. at JA1174-75.

Third, Nappi's burden of proof with regard to its affirmative defenses is substantially incorporated in the instructions the District Court gave the jury as to the EPA claim. The District Court eliminated the affirmative defenses set forth in Section 206(d)(1) that it ruled were not generated by the trial evidence. As noted above, the District Court concluded – and Tourangeau agreed – that the evidence justified an instruction on Nappi's defense of "a business decision, such as adjust its payroll to reflect industry standards, not based on gender." App. at JA1028 & 1030. The District Court also concluded that the evidence justified an instruction as to Nappi's defense based on quantity or quality of production. App. at JA1030. Finally, the District Court instructed the jury that Nappi bore the burden of proof to demonstrate its affirmative defenses are more likely true than not. App. at JA1253. Therefore, the District Court's instruction on Nappi's burden with regard to the affirmative defenses generated by the evidence more than adequately informed the jury as to the controlling law. *See* U.S. Dist. Ct. for Maine – Pattern Jury Instruction for Cases of Employment Discrimination 4.1 & nn. 5-6; *see also Henderson v. Chartiers Valley Sch.*, 136 F. App'x 456, 460 (3d Cir. 2005) (holding that instruction that advised the jury that "*Defendant must prove* that a factor other

44

than sex caused them to set the salaries that they did," (emphasis in original) correctly stated the burden that an employer needed to meet in proving its affirmative defense under the EPA). For all of these reasons, the District Court properly denied Tourangeau's request for the jury instruction she claims she derived from *Corning,* and this Court should affirm that ruling.

## III. THE DISTRICT COURT'S RULINGS DURING JURY SELECTION ON CHALLENGES FOR CAUSE WERE WELL WITHIN ITS CONSIDERABLE DISCRETION.

Tourangeau argues that the District Court erred during jury selection in excusing Juror No. 14 for cause and declining to sustain a cause objection with regard to Juror No. 89. She further contends that Juror No. 89 expressed visible bias at trial and, because he was chosen as the foreperson, his bias likely resulted in the adverse verdict against her. Finally, Tourangeau argues on appeal that Nappi engaged in "gender-based discrimination in the use of its preemptory and for cause challenges," which resulted in a jury that was neither impartial nor appropriately inclusive of women. Blue Br. at 43. Tourangeau's contentions are without merit.

This Court has held that "a trial court enjoys wide discretion in ruling on challenges for cause." *Kotler v. Am. Tobacco Co.*, 926 F.2d 1217, 1228 (1st Cir. 1990) (citing *Dennis v. United States*, 339 U.S. 162, 168 (1950)). Therefore, absent manifest juror prejudice, this Court will not set aside a judge's actions in empaneling a jury which the judge reasonably considers to be suitable and

impartial. *Id*. (citing *McNeill*, 728 F.2d at 9). This Court has emphasized that "there must be strong evidence that the judge was hoodwinked or his judgment grossly in error before an appellate court will interfere." *Id.* (citation omitted). For the reasons discussed below, there is no evidence – and certainly no strong evidence – that the District Court's judgment was in error in evaluating whether the jurors at issue would be suitable and impartial.

### A. The District Court properly excused Juror No. 14 for cause and Tourangeau has waived any *Batson*-style argument.

The District Court did not abuse its discretion in striking Juror No. 14 for cause. Despite Tourangeau's rationalizations to the contrary, Juror No. 14 admitted that she would be "more likely to lean towards someone who is being undercompensated, and given the political climate, given my own experiences, I – I would be more likely to lean that way." App. at JA117. The Magistrate Judge was able to observe the juror when she spoke those words and her hesitancy in responding to questions about whether she could be fair and impartial. App. at JA120-21. He justifiably understood her comment about leaning in favor of someone who is being undercompensated to refer to a predisposition, and not an indication as to how she would rule based solely on the evidence. *Id*. The Magistrate Judge noted Juror No. 14's prior personal experience with an unequal pay issue was a close parallel to the allegations in this case. *Id*. Given those observations, the District Court correctly excused her from the jury. *See United*

*States v. Encarnacion*, 26 F.4th 490, 502 (1st Cir. 2022) (holding that the district court's decision to strike a juror who expressed doubt about her ability to be fair fell "comfortably within the encincture of the district court's discretion") (citations omitted).

In any event, the exclusion of Juror No. 14 from the jury would not justify a new trial. Tourangeau appears to suggest that her removal from the jury pool would justify a new trial because she wanted more women on the jury, going as far as to assert that Nappi engaged in unconstitutional "gender-based discrimination" in the use of its challenges. Blue Br. at 43. As an initial matter, Tourangeau's speculation as to what motivated Nappi to exercise its peremptory challenges is both erroneous and entirely baseless. In any event, Tourangeau is foreclosed from relying on a *Batson*-type argument because she did not raise it when Nappi exercised its challenges. To the contrary, Tourangeau confirmed on three separate occasions after the parties exercised their respective peremptory challenges that she was satisfied with the jury and had no further issues to raise. App. JA133, 134, & 137. Therefore, Tourangeau's *Batson*-style argument has been waived. *See Sanchez v. Roden*, 753 F.3d 279, 295 n.10 (1st Cir. 2014) (holding that a party had waived *Batson* objection to particular jurors by failing to object to the peremptory challenges at the time they were exercised). For all these reasons, the District Court

was justified in striking Juror No. 14 for cause, and this Court should affirm that ruling.

**B.    The District Court properly declined to excuse Juror No. 89 for cause and Tourangeau waived her juror bias argument.**

The District Court also did not abuse its discretion in refusing to strike Juror No. 89 for cause. Contrary to Tourangeau's suggestion on appeal, Juror No. 89 did not "hedge" on his ability to be fair and impartial based on his prior litigation experience. In fact, the Magistrate Judge made a point of confirming that Juror No. 89's use of the term "not necessarily" in response to queries should not be interpreted as doubt about his impartiality:

> THE COURT: Do you think that would in any way affect your ability to evaluate the evidence, and if the plaintiff was able to prove her case, based on the law and the facts that you found, would you have any difficulty ruling in favor of the plaintiff?
>
> JUROR 89: Not necessarily, I don't think I would, no.
>
> THE COURT: Okay. The only thing that gives me hesitancy is when you say not necessarily. Is there something that caused you to have some hesitancy or that -- that maybe there is something lingering there that could -- could affect that assessment?
>
> JUROR 89: No, sir, no.
>
> THE COURT: Okay.
>
> JUROR 89: I think that's just a figure of speech.
>
> THE COURT: Figure of speech.
>
> JUROR 89: Right.

THE COURT: Okay. So you're confident -- again, not putting words in your mouth, I'll ask it more in a direct way. Are you confident that if you were seated as a juror that both sides would have the opportunity -- a fair opportunity before you, that is you would evaluate the evidence and decide the case on the merits?

JUROR 89: Yes, I do.

App. at JA102-03.

In rejecting Tourangeau's request to strike Juror No. 89 due to his prior litigation experience,[5] the Magistrate Judge noted his own observations about Juror No. 89's responses and his demeanor. App. at JA105-06. He indicated that the juror had satisfied him that the juror's experience as a defendant in a medical malpractice case twenty-two years prior would not affect his ability to be fair and impartial in this case. *Id*. In particular, the Magistrate Judge noted:

And I, too, was struck by his last response when [Tourangeau's counsel] asked him directly about the – whether this caused him to kind of view the civil justice system in a negative way or in a negative light and that too many lawsuits are filed, and despite the fact that he felt he had done his job and he understood why the lawsuit was brought. I don't think he harbors any bitterness towards – he didn't

---

[5] Although Tourangeau alludes to Juror No. 89's affiliation with Northern Lights in the Statement of Case section of her brief, she does not argue that Juror No. 89 should have been excluded for cause for that reason. Therefore, she has waived the issue on appeal. *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) (citations omitted) (applying the "settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived"). In any event, as the record reflects, while Tourangeau questioned Juror No. 89 about his knowledge – or lack thereof – with regard to claims against his employer, Northern Lights, she never moved to strike him for cause based on that issue. J.S. at 65/3 to 66/22. Therefore, she has waived that issue as a ground for dismissal for cause. *See United States v. McNeill*, 728 F.2d 5, 10 (1st Cir. 1984) (holding that a party who fails to challenge a juror during voir dire waives that challenge, absent clear injustice).

express any bitterness toward the – the plaintiff or the system. He – in response to my questions about being fair to both parties, I mean I thought he answered that directly and appropriately if he is going to remain. So I understand the concerns, and I'm going to overrule the objection, and Juror 89 will remain in the pool and he can return to his seat.

*Id*.

The Magistrate Judge rejected Tourangeau's attempt to equate the experiences and presentation of Juror Nos. 14 and 89. In doing so, he made it clear that both the jurors' answers and his observations of their demeanor were important distinguishing factors:

THE COURT: I'm not going to compare one juror to the next. The juror that was sued that's seated has nothing to do with employment, nothing to do with disparate pay allegation, nothing to do with what is perceived to be unequal. So the fact that there is a lawsuit filed against somebody is a separate issue from whether there are experiences similar to the plaintiff in this case or a party in this case, that's really the distinction.

I cut you off, so I'm sorry, so make sure – make sure you get on the record, Ms. Quinlan, everything you want to say. I – I get it, so feel free to share the –

MS. QUINLAN: No, no worries, that's okay. That's all right.

THE COURT: No, I – I do understand, and, believe me, as I weigh these rulings I am aware of how one ruling may affect another ruling, or be perceived, and I think it's understandable that you point out the distinction that you point out. I just see this as too close to the plaintiff's actual claim, the substance of pay and differential disparate pay based on gender which unfortunately it sounds like the juror was – the juror experienced herself, and for that very direct similar experience to what the plaintiff is claiming I would be surprised if it didn't impact how she saw the evidence, frankly. I think it would be

understandable; I think her hesitation reflects that. But I certainly acknowledge why you are pointing to the physician juror having been a party to a lawsuit yet staying in the pool. I understand, but I just see a distinction in terms of the substantive claim –

MS. QUINLAN: Sure.

App. at JA121-22.

In any event, the inclusion of Juror No. 89 in the jury[6] would not justify a new trial. To the extent Tourangeau's argument is based on a concern that his conduct during trial indicated bias, she has waived her objection. Tourangeau suggests that Juror No. 89 was "visibly angry" during witness examinations and "looked incensed" during her closing argument. One can only assume – in part because Tourangeau has presented no evidence to suggest otherwise – that Tourangeau was aware of these alleged actions during trial. By waiting until her Amended Motion for New Trial to raise these allegations, Tourangeau waived them as a basis to prove juror bias. *See United States v. Desir*, 273 F.3d 39, 43 (1st Cir. 2001) (holding that a party "who has knowledge of juror misconduct or bias at the time of trial waives such a claim by failing to raise it until after trial") (citing *United States v. Costa*, 890 F.2d 480, 482 (1st Cir. 1989)). This waiver rule has

---

[6] Of course, Tourangeau could have prevented Juror No. 89 from sitting on the jury by exercising one of her peremptory challenges to remove him. She has not suggested she had a concern that the jurors she did remove from the jury pool with her peremptory challenges were biased or unable to be fair and impartial. If she really believed Juror No. 89 presented such a risk, then the natural course would have been to remove him. Having decided not to do so, she can hardly complain about his service on the jury.

been adopted by this Court because "any other rule would allow [a party] to sandbag the court by remaining silent and gambling on a favorable verdict, knowing that if the verdict went against them, they could always obtain a new trial by later raising the issue of juror misconduct." *United States v. Costa*, 890 F.2d 480, 482 (1st Cir. 1989). And even assuming – as we must, since there is no competent admissible evidence to support it – that Juror No. 89's expressions could be interpreted as suggesting anger, Tourangeau has nothing but speculation to support her argument of bias, since there is no evidence as to why Juror No. 89 might have been upset. *See United States v. Gibson*, 353 F.3d 21, 26 (D.C. Cir. 2003) (holding that defense counsel's "unsubstantiated suspicion" of juror bias based on the juror's facial expressions does not, on its own, require the district court to conduct jury questioning) (citing *United States v. Thornton*, 746 F.2d 39, 50 (D.C. Cir. 1984)). For all of these reasons, Tourangeau has failed to establish that the District Court's decisions during jury selection were erroneous, and this Court should affirm those decisions.

## IV. THE DISTRICT COURT CORRECTLY RULED THAT TOURANGEAU PRESENTED NO EVIDENCE OF JUROR BIAS OR MISCONDUCT.

Tourangeau argues on appeal that a new trial is warranted because a juror both failed to respond accurately to voir dire questions and displayed such visible bias and hostility against her that his presence tainted the entire jury pool.

Applying Supreme Court precedent, this Court has held that "[t]o secure a new trial based on a juror's inaccurate answers during *voir dire*, 'a party must first demonstrate that a juror failed to answer honestly a material question on *voir dire*, and then further show that a correct response would have provided a valid basis for cause.'" *Crowley*, 303 F.3d at 407 (quoting *McDonough Power Equip.*, 464 U.S. at 556). A party seeking a new trial on that basis "must do more than raise a speculative allegation that the juror's possible bias may have influenced the outcome of the trial." *Dall*, 970 F.2d at 969. The complaining party must "demonstrate actual prejudice or bias," *United States v. Aponte-Suarez*, 905 F.2d 483, 492 (1st Cir. 1990), which "must be sustained not as a matter of speculation, but as a demonstrable reality," *United States v. Uribe*, 890 F.2d 554, 562 (1st Cir. 1989). This Court has emphasized that "hints of bias [are] not sufficient," and that "only '[d]emonstrated bias in the responses to questions on voir dire may result in a juror's being excused for cause.'" *Sampson v. United States*, 724 F.3d 150, 165 (1st Cir. 2013) (alterations in original) (quoting *McDonough*, 464 U.S. at 554). Tourangeau has presented no competent evidence of either dishonesty or a basis to challenge for cause.

First, there is no evidence that Juror No. 161 failed to answer honestly a material question on voir dire. In her motion to disqualify, the only questions Tourangeau suggested Juror No. 161 failed to answer honestly are questions seven

and eight on the written questionnaire. ECF No. 186, ¶¶ 1-5. As the District Court noted during its careful assessment of this issue at trial, there is no competent evidence to support that suggestion. App. at JA1239-40. Question seven asked whether the jurors had any strong feelings or philosophical beliefs about laws that protect against discrimination of individuals with certain medical conditions, including pregnancy, that might interfere with their ability to be fair and impartial in a case in which the laws might apply. ECF No. 139, at 2. Juror No. 161 answered "no." App. at JA053. Tourangeau has presented no evidence of any feelings or beliefs *held by Juror No. 161* relative to such laws or that he was lying about his opinion of his ability to be fair and impartial in a case involving such laws. Similarly, question eight asked whether the jurors had any strong personal feelings or philosophical beliefs about an individual's ability to bring a lawsuit to recover money damages that might interfere with their ability to be a neutral impartial decision-maker in a case in which a person is seeking money damages. ECF No. 139, at 2. Again, Juror No. 161 answered "no." App. at JA053. Tourangeau has presented no evidence of any feelings or beliefs *held by Juror No. 161* relative to lawsuits for money damages or that he was lying about his opinion of his ability to be fair and impartial in a case involving such claims.[7]

---

[7] In her brief, Tourangeau suggests that questions seven and eight were "designed to ferret out bias on the part of potential jurors when it came to women's rights, pregnancy, sexual harassment, and related issues." Blue Br. at 44-45. However, that suggestion is not entirely

In lieu of such evidence, Tourangeau has either intimated or stated that Juror No. 161 is a member of, part of, or associated with a group – in her disqualification motion she characterized it as a "secret group" – on Facebook called "#FEDUP" or "100PercentFEDUP." ECF No. 186, ¶ 9; ECF No. 219, at 37. This representation, whether implicit or explicit, is simply inaccurate. The Facebook page she references is not a group; it is a Facebook page dedicated to the website 100PERCENTFEDUP.com, which was created by two women, Leise Audette and Patty McMurray, to express conservative views. ECF No. 187, ¶¶ 4-5. Tourangeau can – and does – speculate freely as to what it means for a person to like a Facebook page, but, as the District Court noted, there is no evidence to substantiate that speculation:

> Well, I mean I hear you, but there is really no evidence of that. I hear what you're telling me, but I don't – I'm not so sure that there is evidence of that.

App. at JA1232. In addition, there is no evidence as to: one, when Juror No. 161 "liked" the page; two, what posts to the page, if any, Juror No. 161 actually saw, commented on, or liked; or three, whether Juror No. 161 agreed or disagreed – in whole or in part – with the material in posts on the page. There is also no evidence on Juror No. 161's personal Facebook page that would suggest he liked or agreed

---

accurate. While pregnancy is mentioned in question seven, none of the other topics listed by Tourangeau – women's rights, sexual harassment, and "related issues" – are mentioned in either question.

with any of the viewpoints expressed on the 100PERCENTFEDUP Facebook page. Nor is there anything about the Facebook page or Juror No. 161's personal Facebook page that illuminates *Juror No. 161's* feelings or philosophical beliefs[8] about anti-discrimination laws or lawsuits for money damages. Tourangeau has presented no evidence that Juror No. 161 saw, shared, commented upon, or liked the posts on the Facebook page she has identified – or any particular posts for that matter – that would illuminate *his* feelings or philosophical beliefs or *his* opinion of his ability to be fair and impartial concerning the issues presented in this case.[9] Tourangeau's unsupported speculation to the contrary is irrelevant.

In particular, Tourangeau's reliance on Juror No. 161's apparent "liking" of the above-referenced Facebook page to suggest that Juror No. 161 lied in his responses to questions seven and eight is misplaced. As an initial matter, Nappi would note that the assertions Tourangeau has made about Juror No. 161's conduct are not supported by affidavits or authenticated documents or anything else of evidentiary quality; therefore, it would appear that the Court would be justified in

---

[8] Notably, in distinguishing this case from *United States v. French*, 904 F.3d 111 (1st Cir. 2018), the District Court properly observed that questions seven and eight seek the juror's own opinion on his or her ability to be fair and impartial – not specific factual questions. Based on this, the District Court properly concluded that Tourangeau had not produced any evidence that Juror No. 161 had lied in responding to voir dire.

[9] Moreover, Tourangeau's suggestion that someone from Nappi contacted Juror No. 161 to tell him to remove this "like" from his Facebook page is based on nothing more than speculation entirely devoid of fact. Another explanation for the removal of the "like" is that the Facebook Page is no longer active, as is currently the case. In any event, this Court should ignore these groundless allegations.

rejecting Tourangeau's argument for lack of competent evidence. *See, e.g.,*

*Cabrera v. Macomber*, No. 1:15-cv-01547-LJO-EPG-HC, 2018 U.S. Dist. LEXIS

132969, at *51 (E.D. Cal. Aug. 7, 2018) (denying a motion for new trial based on

juror misconduct on the grounds that the moving party failed to support its request

with competent evidence) (quoting *Anderson v. Calderon*, 232 F.3d 1053, 1098

(9th Cir. 2000)). In any event, as noted above, the fact that Juror No. 161 at some

time in the undetermined past liked a Facebook page to which persons over time

have posted a variety of viewpoints does not constitute evidence that he even

knows about – let alone agrees with – everything that has been posted. Certainly,

Tourangeau has produced no evidence to the contrary. Finally, there is nothing

about the Facebook page that would suggest – let alone establish – that Juror No.

161 lied when he indicated he could be fair and impartial in this case.

Second, even if Tourangeau could meet her threshold burden of

demonstrating dishonest responses by Juror No. 161, her assertion of actual

prejudice or bias is nothing more than speculation. Tourangeau contends that her

counsel observed Juror No. 161 rolling his eyes, exhibiting "obvious distain,"

making "biased utterances," and "scoffing" during her trial testimony. Tourangeau

further argued that Juror 161 disregarded certain testimony, although how she

would know that remains a mystery. However, those representations – even if they

are accurate – are both indefinite and speculative. Standing alone, they do not

create a colorable claim of juror misconduct. *See Gibson*, 353 F.3d at 26 (holding that defense counsel's "unsubstantiated suspicion" of juror bias based on the juror's facial expressions does not, on its own, require the district court to conduct jury questioning) (citing *Thornton*, 746 F.2d at 50). Interestingly, the District Court did not draw such conclusions based on his own observations of the juror once the issue was raised:

> As far as watching him, I've watched him. I think we can all take our own views of how he is responding and body language and things of that sort. I haven't heard -- I can't hear him, so I don't know that he has scoffed as has been represented.
>
> He occasionally will look up as if he is sort of frustrated, but I haven't noticed that he has been doing that at any particular time. In other words, he doesn't look up more when Mr. Wall is asking questions as opposed to the plaintiff asking questions. So I'm not convinced, from what I have seen here, that he has exhibited body language and an attitude that would render him disqualified.

App. at JA1242. A similar argument applies to the "biased utterances" and "scoffing" that Tourangeau's counsel claim they heard – these representations are so vague and speculative that they cannot generate a colorable claim of juror misconduct. *See Gibson*, 353 F.3d at 26. For all of these reasons, Tourangeau has failed to meet the standard for a new trial based on a juror's alleged failure to respond accurately to voir dire questions.

## CONCLUSION

For the reasons set forth in this Brief, Appellee Nappi Distributors requests that the First Circuit deny Tourangeau's appeal and affirm the judgment of the United States District Court for the District of Maine and the jury verdict upon which it is based.

Dated at Portland, Maine this 21st day of February, 2024.

Attorneys for Appellee
Monaghan Leahy, LLP
95 Exchange Street, P.O. Box 7046
Portland, Maine 04112-7046
(207) 774-3906

By:   /s/ John J. Wall, III
John J. Wall, III
Bar No. 40729
jwall@monaghanleahy.com

By:   /s/ Laura A. Maher
Laura A. Maher
Bar No. 1203856
lmaher@mleahy.com

**CERTIFICATE OF COMPLIANCE WITH TYPEFACE AND LENGTH
LIMITATIONS**

1. This brief has been prepared using 14 point, proportionally spaced, serif typeface. Specify software name and version, typeface name, and point size below: Prepared with Microsoft Word 2016 in Times New Roman, 14 point; saved as Adobe Acrobat PDF.

2. EXCLUSIVE of the items set forth in Federal Rule of Appellate Procedure 32(f), the brief contains: 15,200 Words.

I understand that a material misrepresentation can result in the Court striking the brief or imposing sanctions. If the Court so directs, I will provide a copy of the word or line print-out.

Dated at Portland, Maine this 21st day of February, 2024.

Attorneys for Appellee
Monaghan Leahy, LLP
95 Exchange Street, P.O. Box 7046
Portland, Maine 04112-7046
(207) 774-3906

By:     /s/ John J. Wall, III
        John J. Wall, III
        Bar No. 40729
        jwall@monaghanleahy.com

# CERTIFICATE OF SERVICE

I hereby certify that I have today filed the foregoing Brief of Appellee with the United States Court of Appeals for the First Circuit via ECF, which will send notification of such filing to all parties of record.

Dated at Portland, Maine this 21st day of February, 2024.

Attorneys for Appellee
Monaghan Leahy, LLP
95 Exchange Street, P.O. Box 7046
Portland, Maine 04112-7046
(207) 774-3906

By:  /s/ John J. Wall, III
John J. Wall, III
Bar No. 40729
jwall@monaghanleahy.com